

FILED

Oct 26 2023, 8:35 am

CLERK
Indiana Supreme Court
Court of Appeals
and Tax Court

ATTORNEY FOR APPELLANT

Russell W. Brown, Jr.
The Region Lawyers, Inc.
Merrillville, Indiana

ATTORNEYS FOR APPELLEE

Theodore E. Rokita
Attorney General of Indiana

Samuel J. Dayton
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| Anthony Cobb, *Appellant-Defendant,* | October 26, 2023 |
| v. | Court of Appeals Case No. 22A-CR-2085 |
| | Appeal from the Lake Superior Court |
| State of Indiana, *Appellee-Plaintiff.* | The Honorable Salvador Vasquez, Judge |
| | Trial Court Cause No. 45G01-2109-F4-168 |

**Opinion by Judge Foley**
Chief Judge Altice and Judge May concur.

**Foley, Judge.**

[1] A jury convicted Anthony Cobb ("Cobb") of three offenses stemming from a traffic stop and a warrantless vehicle search: (1) Class C misdemeanor operating

a vehicle while intoxicated,[1] (2) Class A misdemeanor resisting law enforcement,[2] and (3) Level 4 felony unlawful possession of a firearm by a serious violent felon.[3] Cobb appeals, presenting the following restated issues:

> I. Whether the United States Constitution and Article 1, Section 11 of the Indiana Constitution prohibited admitting evidence from a warrantless vehicle search;
>
> II. Whether the trial court abused its discretion in admitting two recorded phone calls;
>
> III. Whether, by failing to ensure that Defendant's Exhibit 4 was transmitted on appeal, Cobb waived his claim that the trial court erred in excluding this exhibit; and
>
> IV. Whether the trial court abused its discretion in declining to give the "reasonable theory of innocence" jury instruction.

We affirm.

## Facts and Procedural History

On September 13, 2021, the State brought several charges against Cobb. As amended, the information alleged that Cobb committed Class C misdemeanor operating a vehicle while intoxicated, Class A misdemeanor resisting law

---

[1] Ind. Code § 9-30-5-2(a).

[2] I.C. § 35-44.1-3-1(a)(1).

[3] I.C. § 35-47-4-5(c).

enforcement, and Level 4 felony unlawful possession of a firearm by a serious violent felon. The charges stemmed from a traffic stop that led to a warrantless search of a vehicle Cobb had been driving, with the search revealing a firearm under the driver's seat. Ahead of a jury trial, Cobb moved to suppress evidence from the search, alleging that the search was unconstitutional under both the state and federal constitutions. Following a hearing, the trial court denied the motion to suppress. Cobb did not pursue an interlocutory appeal, and the case proceeded to a bifurcated jury trial held on July 5, 2022, and July 6, 2022.

[4] During the first phase of the jury trial, there was evidence that, around 3:30 a.m. on September 12, 2021, Officer George Fields Jr. of the Lake Station Police Department ("Officer Fields") was on patrol when his vehicle's radar system clocked a vehicle speeding. Officer Fields began following the vehicle, and saw the vehicle cross the center line three or four times. Officer Fields then initiated a traffic stop, and the vehicle pulled over to the shoulder of the road.

[5] As Officer Fields walked up to the passenger side of the vehicle, he smelled the odor of alcohol emanating from the vehicle. He also saw an open bottle of tequila on the "passenger seat floorboard." Tr. Vol. IV p. 21. Cobb—the driver—was the only person in the vehicle. Officer Fields smelled alcohol on Cobb's breath, and he noticed the odor of alcohol emanating from Cobb's person. Officer Fields also noticed that Cobb's speech was slurred, his eyes were "glossy," and his face was flushed. *Id.* at 23. Officer Fields called for a backup officer. While waiting for the officer to arrive, Officer Fields directed Cobb to keep his hands on the steering wheel. However, Cobb did not comply.

At first, Cobb was "[j]ust not showing his hands[.]" *Id.* at 25. Once Cobb showed his hands, he "kept moving them around" and "became fidgety." *Id.* Officer Fields thought Cobb was "showing signs of nervousness," which concerned Officer Fields. *Id.*

[6] Before long, Officer David Wright of the Lake Station Police Department ("Officer Wright") arrived. At that point, Officer Fields asked Cobb to step out of the vehicle. Cobb did not immediately do so, complying only after Officer Fields asked "more than two or three times." *Id.* When Cobb stepped out of the vehicle, he "kept saying hold on, hold on[.]" *Id.* at 26. He reached into the center console of the vehicle and retrieved a cellphone, telling Officer Fields: "I got to record this." *Id.* Cobb began recording the encounter on his cellphone.

[7] Officer Fields asked if Cobb "had been drinking that night," and Cobb said he had consumed "[a] few" or "a couple" of alcoholic beverages. *Id.* Officer Fields then asked Cobb to perform field sobriety tests. Cobb refused, saying: "[I]f it's going to put me in jail, I'm not going to do it." *Id.* at 28. Officer Fields also asked Cobb to take a portable breath test, and Cobb refused. Officer Fields then handcuffed Cobb, arresting him for operating while intoxicated. At that point, Officer Fields stood near Cobb with his hand on Cobb's wrists.

[8] Because Cobb was arrested, and there was "nobody else . . . in the vehicle to take possession of it," Officer Wright called for a tow truck. *Id.* at 29. Officer Wright then opened the driver's door of the vehicle to "perform an inventory and search incident to arrest search on the vehicle." *Id.* at 93. As soon as

Officer Wright opened the door, Cobb "began to start pulling away" from Officer Fields. *Id.* at 30. Cobb managed to break free from Officer Fields's grip. When Cobb broke free, he lunged in the direction of the driver's door. Officer Fields regained control over Cobb and instructed him several times to stop pulling away. Cobb continued to pull away. To maintain control over Cobb, Officer Fields had to "physically bend [Cobb] over the hood of the car . . . so he could not move." *Id.* at 35. Officer Wright came to the front of the vehicle to help restrain Cobb, who was flailing his arms, shoulders, and legs "as much as he could," to the point that the officers "knew keeping [Cobb] on the front of the vehicle was not the safe option." *Id.* at 111. The two officers "took [Cobb] to the grassy area next to the vehicle" and held Cobb on the ground. *Id.* at 94. Officer Wright called dispatch to request backup. When backup arrived, Cobb was moved into a police vehicle while Officer Wright observed him nearby.

[9]     Officer Fields then "conducted his inventory and search incident to arrest" search of the vehicle Cobb had been driving. *Id.* at 95. Officer Fields testified that he found a firearm under the driver's seat of the vehicle. He testified that the firearm was loaded and positioned so that the driver "could just reach down and grab it if need be," with "the handle of the gun . . . kind of flush with the driver's seat[.]" *Id.* at 34. He added: "The barrel was pointed toward the back, and the handle . . . was facing outward to where it was pretty easily able to be grabbed." *Id.* at 83. The vehicle Cobb was driving was registered to a person named Yvonne Cobb ("Yvonne"), who had a valid permit to carry a firearm.

The firearm seized from the vehicle was purchased by a male person other than Cobb, and the firearm had not been reported stolen.

[10] At trial, Cobb timely objected to the admission of all evidence obtained from the vehicle search, including the firearm seized during the search. Cobb also moved to "[i]ncorporate the previous arguments" he had made when litigating the pretrial motion to suppress. *Id.* at 31. The trial court said it would incorporate the arguments. The court then overruled the objection. Cobb asked the trial court to recognize a continuing objection, which it did. The court then summarized its recent rulings, stating as follows: "Incorporated by reference, a hearing conducted outside the jury's presence, the objection is noted. It will be [a] continuing objection consistent with the rules." *Id.*

[11] The State sought to admit recordings of two phone calls Cobb made from jail on June 29, 2023, the day after the trial court denied the motion to suppress, and June 30, 2023. In each call, Cobb spoke with Yvonne.[4]

[12] Cobb objected to the admission of the recordings, asserting the evidence was not relevant and unfairly prejudicial. The State responded that the evidence was relevant and highly probative of Cobb's consciousness of guilt, arguing that "the gist" of the evidence was that Cobb told Yvonne: "[Y]ou need to come in here and take responsibility for the gun that's in your car." *Id.* at 140. Cobb

---

[4] On appeal, Cobb admits that the calls were "between [him] and Yvonne[.]" Appellant's Br. p. 9. At one point, Cobb asserts that Yvonne is his sister. *See id.* at 8.

argued that the recorded statements were not as "explicit" as the State represented, with the State "trying to interpret and make that argument [as to] what [Cobb] [wa]s talking about[.]" *Id.* at 141. Although the State agreed that the recorded statements were "not explicit," the State claimed that "the whole call" indicates that Cobb wanted Yvonne to take responsibility for the firearm. *Id.* As to relevance, Cobb contended that the recordings "would be relevant if [Yvonne] were to come in and testify to show her motive, her bias of the reason why she's testifying[.]" *Id.* at 139. However, Cobb asserted that Yvonne would not be testifying.

[13] Before making its evidentiary ruling, the trial court listened to each recording. The court ultimately admitted the recordings over Cobb's objection, noting:

> [I]f he's making comments about having a witness come in his case and making . . . even these generalities, I think that's sufficient and it really goes more to the weight that the jury would give it and not the admissibility. I think this information is relevant. I think it's certainly probative [of] the defendant's state of mind.

*Id.* at 145. As to whether the evidence was unfairly prejudicial, the trial court decided that "the prejudice is not so substantial that it should keep the information out" under Indiana Evidence Rule 403. *Id.* at 146.

[14] After the State rested, Cobb called Officer Fields as a witness. At one point, Cobb moved to introduce Defendant's Exhibit 4, which consisted of a video clip assembled from Cobb's cellphone recording of the traffic stop. The State objected, alleging that the video clip contained inadmissible hearsay. During an

ensuing sidebar discussion, Cobb asserted that the evidence was not being used for the truth of the matter asserted, but to prove that Cobb did not have slurred speech. The State again argued the evidence contained inadmissible hearsay. The State also argued: "We are just getting this certain section they want to play." *Id.* at 179. The State expressed concern that the video footage contained in Defendant's Exhibit 4 "could have been cherrypicked out and chosen for today," and asserted the State was also objecting on that basis. *Id.* at 180.

[15] The trial court concluded that the clip contained inadmissible hearsay and sustained the State's objection. After further discussion, Cobb asked the trial court "to allow Defendant's Exhibit 4 . . . for an offer of proof," and the trial court agreed to retain the proffered exhibit for that purpose. *Id.* at 186.

[16] Once the defense rested, the trial court addressed final jury instructions. Cobb said he "would re-tender and re-request the burden of proof instruction," seeking an instruction containing language "that the evidence must be so convincing to overcome every reasonable theory of innocence." *Id.* at 193. According to Cobb, this instruction was proper under the circumstances because the State had a "purely . . . circumstantial case" for the count of operating a vehicle while intoxicated and the firearm-related count. *Id.* Cobb "concede[d] that there [was] direct evidence" for the count of resisting law enforcement. *Id.* The trial court ultimately declined to give the instruction, reasoning that, because there was direct evidence as to at least one of the charges, "[i]t is clearly a mix," and the instruction was improper. *Id.* at 196.

[17]     After the initial phase, the jury determined that Cobb was guilty of Class A misdemeanor resisting law enforcement and Class C misdemeanor operating a vehicle while intoxicated, and that Cobb had possessed a firearm. The jury trial proceeded to the next phase, and the jury returned a guilty verdict for Level 4 felony unlawful possession of a firearm by a serious violent felon. The trial court later held a sentencing hearing, imposing concurrent sentences for an aggregate term of five years in the Department of Correction. Cobb appeals.

# Discussion and Decision

## I. Evidence from the Warrantless Vehicle Search

[18]     On appeal, Cobb presents several evidentiary challenges, among them, a challenge to the trial court's decision to admit evidence stemming from the search of the vehicle, including the firearm seized during the search. According to Cobb, the search violated the Fourth Amendment to the United States Constitution and Article 1, Section 11 of the Indiana Constitution.

[19]     In general, a trial court has "broad discretion to admit or exclude evidence[.]" *Satterfield v. State*, 33 N.E.3d 344, 352 (Ind. 2015). Whenever the trial court makes an evidentiary ruling, the court generally considers "the foundational evidence presented at trial." *Carpenter v. State*, 18 N.E.3d 998, 1001 (Ind. 2014). However, "[i]n ruling on admissibility following the denial of a motion to suppress," the trial court "also considers the evidence from the suppression hearing that is favorable to the defendant"—but the trial court considers this additional evidence "only to the extent it is uncontradicted at trial." *Id.*

[20] Our role is not to reweigh the evidence presented to the trial court. *See id.* Rather, "[b]ecause the trial court is best able to weigh the evidence and assess witness credibility, we review its rulings on admissibility for abuse of discretion," reversing "only if a ruling is 'clearly against the logic and effect of the facts and circumstances and the error affects a party's substantial rights.'" *Id.* (quoting *Clark v. State*, 994 N.E.2d 252, 260 (Ind. 2013)). However, to the extent the trial court's evidentiary ruling turns on the constitutionality of a search or seizure, "the ultimate determination of the constitutionality of a search or seizure is a question of law that we consider de novo." *Id.*

### A. Fourth Amendment

[21] The Fourth Amendment generally requires that law enforcement obtain a warrant before conducting a search or seizure, specifying that "[t]he right of the people to be secure in their persons, houses, papers, and effects, against unreasonable searches and seizures, shall not be violated[.]" This text "makes clear" that the ultimate touchstone of the Fourth Amendment is reasonableness. *Lange v. California*, 141 S. Ct. 2011, 2017 (2021) (citing *Brigham City v. Stuart*, 547 U.S. 398, 403 (2006)). As the United States Supreme Court has explained, warrantless searches—i.e., "searches conducted outside the judicial process, without prior approval by [a] judge or magistrate[—]are *per se* unreasonable under the Fourth Amendment[.]" *Arizona v. Gant*, 556 U.S. 332, 338 (2009) (quoting *Katz v. United States*, 389 U.S. 347, 357 (1967)). However, there are "a few specifically established and well-delineated exceptions" to the warrant requirement. *Katz*, 389 U.S. at 357. "Among the exceptions . . . is a

search incident to a lawful arrest." *Gant*, 556 U.S. at 338. There is also an exception for an inventory search of a vehicle conducted "pursuant to standard police procedures[.]" *South Dakota v. Opperman*, 428 U.S. 364, 372 (1976).

[22] On appeal, Cobb argues that the firearm was seized pursuant to an invalid inventory search. Although the State contends that the search satisfied this exception, the State also examines whether the search was justified under a different exception. In his Reply Brief, Cobb argues that, because the State focused on the inventory exception at trial, principles of waiver preclude the State from presenting an alternative appellate justification for the search. In so arguing, Cobb acknowledges there is caselaw stating that an appellate court may "uphold a correct legal ruling even if based upon incorrect or absent legal reasoning below[.]" Reply Br. p. 7. However, he argues that the State exclusively relied upon caselaw "applying the rules of evidence and not evidentiary rulings based upon constitutional questions." *Id.* According to Cobb, because there was a constitutional dimension to the instant evidentiary ruling, we should limit our analysis and focus only on the inventory exception.

[23] In affirming an evidentiary ruling—even a ruling involving a constitutional question—this Court is not bound by any legal theory for admitting or excluding the evidence. *See Ratliff v. State*, 770 N.E.2d 807, 809 (Ind. 2002) (affirming on different constitutional grounds the decision to admit evidence from a search); *Wilson v. State*, 966 N.E.2d 1259, 1263 (Ind. Ct. App. 2012) (same), *trans. denied*. Rather, "[a]s an appellate court, we may affirm a trial court's judgment on any theory supported by the evidence." *Ratliff*, 770 N.E.2d

at 809. In other words, so long as the record provides a proper basis for the trial court's ruling, the ruling itself is not erroneous. *See id.* Thus, if there is a "legal ground apparent in the record" that supports the evidentiary ruling, *id.*, we may discuss that legal ground without addressing any other potential ground, *see id.*

[24] In this case, we accept the State's invitation to consider whether the warrantless search satisfied an exception other than the inventory exception. We proceed to examine whether the search satisfied the exception for a search incident to a lawful arrest. This exception generally "authorizes police to search a vehicle incident to a recent occupant's arrest[.]" *Gant*, 556 U.S. at 343. The exception applies in two scenarios: (1) "when the arrestee is unsecured and within reaching distance of the passenger compartment at the time of the search," *id.*, and (2) "when it is reasonable to believe that evidence of the offense of arrest might be found in the vehicle," *id.* at 335. As to this latter scenario, "[i]n many cases, [such] as when a recent occupant is arrested for a traffic violation, there will be no reasonable basis to believe the vehicle contains relevant evidence." *Id.* at 343. For example, when a defendant "was arrested for driving with a suspended license, officers could not expect to find evidence of this crime in the vehicle." *Meister v. State*, 933 N.E.2d 875, 878 (Ind. 2010). However, under certain circumstances, "the offense of arrest will supply a basis for searching the passenger compartment of an arrestee's vehicle and any containers therein." *Gant*, 556 U.S. at 344. The Indiana Supreme Court has explained that, in these instances, the warrantless vehicle search is justified by law enforcement's need to preserve evidence. *See State v. Hobbs*, 933 N.E.2d 1281, 1285 (Ind. 2010).

When the United States Supreme Court articulated the scope of this exception, the Court collected cases where it was reasonable for officers to believe that evidence of the offense might be in the vehicle. *See Gant*, 556 U.S. at 344. One such case was *New York v. Belton*, where a police officer conducted a warrantless search of a vehicle after arresting the occupants for possession of marijuana. 453 U.S. 454, 456 (1981). Before conducting the search, the officer "had smelled burnt mari[j]uana and had seen on the floor of the car an envelope marked 'Supergold' that he associated with mari[j]uana." *Id.* at 455–56.

Similar to the circumstances in *Belton*, here, Officer Fields arrested Cobb for operating a vehicle while intoxicated after (a) seeing Cobb weaving on the roadway; (b) observing Cobb's flushed face, glossy eyes, and slurred speech; (c) smelling alcohol on Cobb's breath; (d) noticing the odor of alcohol emanating from Cobb's person; and (e) seeing an open bottle of tequila on the passenger side floorboard of the vehicle. Under these circumstances, it was reasonable to believe that evidence of operating while intoxicated may be found under the driver's seat. We therefore conclude that the search was justified as a search incident to arrest. *See Gant*, 556 U.S. at 335 ("[C]ircumstances unique to the vehicle context . . . justify a search incident to a lawful arrest when it is 'reasonable to believe evidence relevant to the crime of arrest might be found in the vehicle.'" (quoting *Thornton v. United States*, 541 U.S. 615, 632 (2004) (Scalia, J., concurring))); *compare Meister*, 933 N.E.2d at 878 (vehicle search was not justified under this exception when the offense of arrest was driving with a suspended license) *with Belton*, 453 U.S. at 456 (vehicle search was justified

when the offense of arrest was possession of marijuana, the officer smelled marijuana, and the officer saw an envelope in the vehicle with writing on it associated with marijuana (discussed with approval in *Gant*, 556 U.S. at 344)).

### B. Article 1, Section 11

Cobb also argues that evidence from the search was subject to exclusion because the search violated Article 1, Section 11 of the Indiana Constitution.

The language in Article 1, Section 11 of the Indiana Constitution is nearly identical to the language in the Fourth Amendment, with both constitutional provisions authorizing only reasonable searches. *Compare* Ind. Const. art. 1, § 11 *with* U.S. Const. amend. IV. However, we "interpret Article 1, Section 11 independently." *Hardin v. State*, 148 N.E.3d 932, 942 (Ind. 2020). When we determine whether a search was reasonable under Article 1, Section 11, we look to "the totality of the circumstances," applying the framework from *Litchfield v. State*, 824 N.E.2d 356, 361 (Ind. 2005). *Hardin*, 148 N.E.3d at 942. As to that framework, although a case could present "other relevant considerations," the reasonableness of a search generally turns on a balancing of "1) the degree of concern, suspicion, or knowledge that a violation has occurred, 2) the degree of intrusion the method of the search or seizure imposes on the citizen's ordinary activities, and 3) the extent of law enforcement needs." *Litchfield*, 824 N.E.2d at 361. When weighing these factors—known as the *Litchfield* factors—we consider "the full context in which the search . . . occurs." *Hardin*, 148 N.E.3d at 943. And we consider these factors whether or not there was a warrant. *Id.*

[29]     In challenging the constitutionality of his search under Article 1, Section 11, Cobb directs us to his Fourth Amendment analysis and asserts that "the State failed to present any evidence that Officers Fields'[s] search of [the] vehicle was reasonable." Appellant's Br. p. 14. As to the *Litchfield* factors, Cobb contends that (1) "[t]here was no evidence presented . . . that Officer Fields had any degree of concern, suspicion or knowledge that a violation occurred"; (2) "[t]here was no evidence presented to establish what, if any, law enforcement needs Officer Fields was satisfying"; and (3) "Officer Fields's actions constituted a significant degree of intrusion of Mr. Cobb's rights." *Id.* Cobb also seems to suggest that, at trial, the State failed to present any foundational evidence supporting the constitutionality of the search. That is, he asserts that the State presented foundational evidence at the hearing on the motion to suppress, but this foundational evidence cannot be relied upon because "the State never asked the trial court to incorporate the evidence previously presented." *Id.* at 15.

[30]     Irrespective of evidence presented at the pre-trial hearing, by the time Cobb objected to the admission of evidence from the search, the State had presented trial testimony from Officer Fields setting forth why Officer Fields conducted the traffic stop (he observed speeding and weaving), what he observed as he approached the vehicle (an odor of alcohol and an open bottle of tequila in the passenger compartment), and what he observed while interacting with Cobb (an odor of alcohol on Cobb's breath and other indicia of intoxication, including Cobb's flushed face and glossy eyes). By then, Officer Fields had also testified

that, before the vehicle search, he arrested Cobb for operating while intoxicated. We therefore disagree with Cobb's suggestion that, at trial, the State failed to present any foundational evidence regarding the reasonableness of the search.

[31] Turning to the first *Litchfield* factor, in examining law enforcement's degree of concern, suspicion, or knowledge that a violation has occurred, "we consider all 'the information available to them at the time' of the search or seizure." *Hardin v. State*, 148 N.E.3d 932, 946 (Ind. 2020) (quoting *Duran v. State*, 930 N.E.2d 10, 18 (Ind. 2010)). Information supporting a vehicle search includes "very recent information indicating that evidence of criminal activity would be in the vehicle." *Id.* at 944. In this case, there was evidence Officer Fields saw Cobb driving the vehicle, noticed Cobb displaying signs of intoxication, smelled the odor of alcohol emanating from Cobb, and observed an open bottle of liquor on the floorboard of the passenger seat. Based on these observations, law enforcement had an extremely high degree of suspicion that (1) Cobb operated a vehicle while intoxicated and (2) evidence of this crime was inside the vehicle. Moreover, because of Cobb's conduct during the roadside encounter, law enforcement had additional suspicion that the vehicle contained contraband. That is, Cobb initially refused to exit the vehicle. Once Cobb was arrested and Officer Wright opened the driver's door to begin a search, Cobb broke free from Officer Fields and lunged toward the driver's door, seemingly trying to thwart the search of the vehicle. Even after the two officers regained control over Cobb, he continued to pull away from them, necessitating a call for backup.

[32]     Regarding the intrusiveness of the search, "we consider the degree of intrusion from the defendant's point of view." *Id.* We also consider the extent to which the search intruded into "both the citizen's physical movements and the citizen's privacy." *Id.* Generally, a vehicle search constitutes an "obvious intrusion into [a person's] privacy." *Id.* at 946. Still, the degree of intrusion can be "lessened by the way officers conducted the search." *Id.* In other words, "how officers conduct a search . . . matters." *Id.* at 945 (emphasis removed).

[33]     Here, the vehicle search did not intrude into Cobb's freedom of movement because Cobb was already in police custody. *See id.* at 946 (identifying no intrusion into physical movements under similar circumstances). And although the vehicle search constituted an intrusion of privacy, here—as in the Indiana Supreme Court's *Hardin* decision—the search "appears to have been no more extensive than a visual inspection of the interior of the vehicle—something someone might do to find a credit card or french fry dropped between a seat and the center console." *Id.* Indeed, it is not as though Cobb is arguing that law enforcement "searched his vehicle in an egregious manner as could've been the case if officers had torn apart his seats or ripped out his dashboard looking for hidden compartments." *Id.* Under these circumstances, we conclude that the search resulted in a moderate degree of intrusion. *See id.* (concluding that there was a moderate degree of intrusion under similar circumstances).

[34]     As to the extent of law enforcement needs, we consider both (1) the general needs of law enforcement and (2) the specific needs of the officers under the circumstances of the search. *Id.* at 946–47. Put differently, "we look to the

needs of the officers to act in a general way"—e.g., to combat drunk driving—and "we also look to the needs of the officers to act in the particular way and at the particular time they did." *Id.* In considering law enforcement needs in a more specific way, "we take a practical approach and do not require officers to undertake duplicative tasks." *Id.* at 947 (giving the example of requiring officers to obtain an independent warrant to test evidence they already lawfully seized).

[35] In this case, law enforcement needed to preserve evidence to help combat drunk driving. Of course, because Cobb—the sole vehicle occupant—was in police custody, there was not an especially high risk of someone driving off with the evidence. *Cf. Myers v. State*, 839 N.E.2d 1146, 1153–54 (Ind. 2005) (upholding a search of a vehicle based in part on elevated law enforcement needs when the vehicle's owner was not under arrest and might have driven the vehicle away). Thus, under the circumstances at hand, law enforcement did not have a considerable need to conduct a warrantless roadside search of the vehicle.

[36] Balancing the three *Litchfield* factors based on the totality of the circumstances, we conclude that the vehicle search was reasonable—especially in light of the extremely high degree of suspicion that evidence of a crime was in the vehicle.

## II. Recorded Calls

[37] Cobb argues that the trial court erred in admitting the recorded phone calls because the evidence was not relevant and, even if the evidence was relevant, the evidence was subject to exclusion because it was unfairly prejudicial.

[38] As to relevance, Indiana Evidence Rule 402 provides that "[i]rrelevant evidence is not admissible." Moreover, under Rule 401, "[e]vidence is relevant if: (a) it has any tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action."

[39] Here, the challenged evidence indicated that on June 29, 2022—the day after the trial court denied Cobb's motion to suppress—Cobb called Yvonne and the two spoke about the ruling. Cobb said he "got the ruling on the gun yesterday" and would soon be going to trial. State's Ex. 4A at 1:05–1:22. Cobb said that someone suggested to "holler at" Yvonne. *Id.* at 2:45–3:00. Cobb told Yvonne: "I told him you had a lot going on, but I guess I'll try." *Id.* at 2:59–3:04.

[40] The challenged evidence also indicates that Cobb called Yvonne the next day. At the beginning of the call, an automated message stated that the call was from an inmate at Lake County Jail. State's Ex. 4 at :02–:05. Cobb told Yvonne that he was "going to be frank and very direct" and choose his words "correctly." *Id.* at :38–:48. Cobb said he spoke with his lawyer and "tried to have this matter resolved differently," but he "was unable to." *Id.* at :50–1:12. Cobb said: "This was the time I needed you." *Id.* at 3:00–3:04. He also said: "I was really done with goofy shit; I was done." *Id.* at 5:02–5:07. Cobb went on to say: "That's your right. You decided to do what you want, but man, if there was ever a time I needed you. . . . This is it. This is it." *Id.* at 5:56–6:22.

[41] On appeal, Cobb asserts that his statements in the calls "were generalities" and that at no point "did [he] ask Yvonne . . . to come and testify or ask her to take

responsibility of the firearm." Appellant's Br. p. 17. Cobb also argues that, to the extent the State claimed the statements were relevant to Cobb's "'mental state' of how he is thinking and feeling," "what [he] was thinking on June 29 and June 30, 2022, nearly ten months from the date of the incident, has . . . no relevance on whether he knowingly or intentionally possessed a firearm." *Id.*

[42] The State responds that the testimony was relevant because "[t]hese calls supported an inference that Cobb was attempting to influence Yvonne's testimony, if she chose to testify." Appellee's Br. p. 26. For this proposition, the State directs us to *Grimes v. State*, wherein the Indiana Supreme Court stated: "Any testimony tending to show an accused's attempt to conceal implicating evidence or to manufacture exculpatory evidence may be considered by the trier of fact as relevant[.]" 450 N.E.2d 512, 521 (Ind. 1983). The Indiana Supreme Court explained that this type of evidence is relevant in a criminal matter because the evidence "reveal[s] a consciousness of guilt." *Id.*

[43] In his Reply Brief, Cobb cursorily states that "[t]he phone calls did not tend to prove any material fact more or less probable[.]" Reply Br. p. 4. Yet, Cobb makes no attempt to distinguish *Grimes. See id.* In light of the Indiana Supreme Court's analysis in *Grimes*, we conclude that the challenged evidence has at least some tendency to indicate that Cobb was conscious of his guilt and trying to manufacture exculpatory testimony. We therefore conclude that the trial court did not abuse its discretion in determining that the recorded phone calls were relevant. *See* Ind. Evidence Rule 401 ("Evidence is relevant if: (a) it has any

tendency to make a fact more or less probable than it would be without the evidence; and (b) the fact is of consequence in determining the action.").

[44] We turn to Cobb's contention that, despite being relevant, the recorded phone calls were subject to exclusion because the evidence was unfairly prejudicial. Under Indiana Evidence Rule 403: "The court may exclude relevant evidence if its probative value is substantially outweighed by a danger of . . . unfair prejudice[.]" The risk of unfair prejudice relates to "the capacity of the evidence to persuade by illegitimate means, or the tendency of the evidence to suggest [making a] decision on an improper basis." *Hall v. State*, 177 N.E.3d 1183, 1193 (Ind. 2021) (quoting *D.R.C. v. State*, 908 N.E.2d 215, 224 (Ind. 2009)). Because "all relevant evidence is 'inherently prejudicial' in a criminal prosecution," the weighing test under Evidence Rule 403 "boils down to a balance of probative value against the likely unfair prejudicial impact . . . the evidence may have on the jury." *Id.* at 1194 (quoting *Richmond v. State*, 685 N.E.2d 54, 55–56 (Ind. 1997)). Furthermore, we afford our "[t]rial courts . . . wide latitude in weighing probative value against the danger of unfair prejudice." *Id.* at 1193.

[45] As to the probative value of the evidence, as earlier noted, the challenged evidence reasonably indicates that Cobb was conscious of his guilt and trying to manufacture exculpatory testimony. Turning to the risk of unfair prejudice, Cobb points out that, because of the evidence, the jury was aware Cobb had been incarcerated. Yet, Cobb directs us to no caselaw regarding the risk of prejudice arising from the jury's awareness that the accused was at one point

incarcerated. Regarding prejudice, Cobb also asserts that the challenged evidence contains his statement that he was "done with this goofy shit," State's Ex. 4A at 5:02–5:07—a statement Cobb claims was unfairly prejudicial because it "referred to [his] lifestyle," Appellant's Br. p. 17. However, we conclude that the trial court was well within its discretion to regard this brief, vague statement as presenting a relatively low risk of unfair prejudice under the circumstances.

[46] Ultimately, in light of a trial court's wide latitude in weighing the probative value of the proffered evidence against the danger of prejudice, we cannot say the trial court erred in declining to exclude these phone calls under Rule 403.

## III. Video Clip

[47] Cobb argues that the trial court erred by excluding Defendant's Exhibit 4, a video clip that showed part of his roadside encounter with law enforcement. Cobb claims that, despite the State's hearsay objection, the evidence should have been admitted because the evidence "was not offered for the truth of the matter asserted[.]" Appellant's Br. p. 18. Rather, Cobb claims that the evidence was offered to help the jury "determine whether [his] speech was slurred as Officer Fields had . . . described." *Id*.

[48] Whenever the trial court's evidentiary ruling excludes evidence, a party preserves a challenge to that ruling only if the party "informs the court of [the] substance [of the evidence] by an offer of proof, unless the substance was apparent from the context." Evid. R. 103(a)(2). Here, Cobb made an offer of

proof, and the court said it would retain Cobb's exhibit for that purpose. Tr. Vol. IV p. 186. Thus, Cobb preserved a claim of error at the trial court level.

[49] Despite properly preserving his claim of error before the trial court, Cobb failed to ensure that a copy of Defendant's Exhibit 4 was transmitted on appeal. As this court recently noted, "it is the appellant's burden to provide us with an adequate record to permit meaningful appellate review." *Martinez v. State*, 82 N.E.3d 261, 263 (Ind. Ct. App. 2017), *trans. denied*. Here, we acknowledge that Cobb requested the trial exhibits in his Notice of Appeal. However, when the exhibit volumes prepared for this appeal ultimately did not contain Defendant's Exhibit 4, it was Cobb's obligation to seek supplementation of the record. *See id.* (discussing the appellant's burden to obtain the record, which—whenever necessary—includes preparing a statement of evidence under Appellate Rule 31). And to the extent Cobb did not discover the omission of the exhibit until his briefing deadline loomed, Cobb could have sought an extension of time. *See* Ind. Appellate Rule 35(A) ("Any motion for an extension of time shall be filed at least seven (7) days before the expiration of time *unless the movant was not then aware of the facts on which the motion is based*." (emphasis added)).

[50] Because Cobb failed to provide Defendant's Exhibit 4 or otherwise address the omission of this exhibit from the appellate exhibit volumes, we conclude that Cobb waived his claim that the trial court erred in excluding the exhibit. *See Martinez*, 82 N.E.3d at 263 (identifying appellate waiver due to a failure to obtain part of the record "integral to our review of [the] arguments").

## IV. Proposed Jury Instruction

Cobb claims the trial court erred by failing to give his proposed "reasonable theory of innocence" jury instruction regarding the burden of proof. According to Cobb, the nature of the State's evidence supported giving this instruction.

"Trial courts generally enjoy considerable discretion when instructing a jury." *Humphrey v. Tuck*, 151 N.E.3d 1203, 1207 (Ind. 2020). When the appellant claims the evidence supported giving a particular jury instruction, we generally review the court's decision for an abuse of discretion. *Id.*; *see Hampton v. State*, 961 N.E.2d 480, 490 (Ind. 2012). However, to the extent the decision turned on a question of law, our review is de novo. *See Humphrey*, 151 N.E.3d at 1207.

Here, Cobb asked the trial court to include the following jury instruction known as the "reasonable theory of innocence" instruction: "In determining whether the guilt of the accused is proven beyond a reasonable doubt, you should require that the proof be so conclusive and sure as to exclude every reasonable theory of innocence." Ind. Pattern Crim. Jury Inst. 13.1000. This instruction is proper only "[w]hen the trial court determines that the defendant's conduct required for the commission of a charged offense, the actus reus, is established *exclusively* by circumstantial evidence[.]" *Lewis v. State*, 34 N.E.3d 240, 246 (Ind. 2015) (emphasis added) (quoting *Hampton*, 961 N.E.2d at 491).

Circumstantial evidence is evidence "based on inference and not on personal knowledge or observation." *Hampton*, 961 N.E.2d at 489 (quoting Black's Law Dictionary 636 (9th ed. 2009)). In contrast, direct evidence is evidence "based

on personal knowledge or observation and that, if true, proves a fact without inference or presumption." *Id.* Put differently: "Direct evidence means evidence that directly proves a fact, without an inference, and which in itself, if true, conclusively establishes that fact. Circumstantial evidence means evidence that proves a fact from which an inference of the existence of another fact may be drawn." *Id.* (quoting *Gambill v. State*, 675 N.E.2d 668, 675 (Ind. 1996)). For example, "footprints or fingerprints that place an accused at the scene of a crime may be direct evidence of the accused's presence at some point in time but only circumstantial proof that the accused committed the charged offense." *Id.* at 489–90; *see also id.* at 490 n.8 (providing additional examples and explanation, noting that "[t]he complexities of distinguishing direct from circumstantial evidence have received considerable academic attention").

[55] In arguing that the trial court erred in refusing to give the "reasonable theory of innocence" instruction, Cobb focuses only on the firearm-related offense. As to this offense, he claims the instruction was proper because the State proved the actus reus—possession of the firearm—exclusively by circumstantial evidence.

[56] "'[P]ossession' . . . can be either actual or constructive." *Sargent v. State*, 27 N.E.3d 729, 732–33 (Ind. 2015). "Actual possession occurs when a person has direct physical control over the item." *Id.* at 733. Constructive possession occurs "when the person has (1) the capability to maintain dominion and control over the item; and (2) the intent to maintain dominion and control over it." *Id.* (quoting *Gray v. State*, 957 N.E.2d 171, 174 (Ind. 2011)).

[57] Cobb asserts that the State pursued a theory that he constructively possessed the firearm. He suggests that, whenever the State pursues a theory of constructive possession, the State necessarily relies exclusively on circumstantial evidence to prove possession. Yet, as the State points out on appeal, among the evidence of Cobb's constructive possession of the firearm was testimony from Officer Fields about the location of the firearm in the vehicle Cobb was driving. That is, Officer Fields testified that he saw the firearm positioned such that it was "pretty easily able to be grabbed" from the driver's seat. Tr. Vol. IV p. 83. Officer Fields also testified that Cobb had occupied the driver's seat, and there were no other occupants in the vehicle. The testimony from Officer Fields was direct evidence that Cobb had the capability to maintain dominion and control over the firearm—a matter the State was trying to prove. *See, e.g.*, *Sargent*, 27 N.E.3d at 733 (noting there are two types of possession and one occurs when a person has the capability and the intent to maintain dominion and control over an item). Thus, the State did not exclusively rely on circumstantial evidence in proving that Cobb possessed the firearm.

[58] Because the State did not exclusively rely on circumstantial evidence to prove the actus reus of the firearm-related offense, we cannot say the trial court abused its discretion in declining to give the proposed jury instruction.

## Conclusion

[59] The trial court did not abuse its discretion in admitting evidence from the warrantless search of Cobb's vehicle, nor did the trial court abuse its discretion

in admitting the recorded phone calls. As to the exclusion of the video clip, Cobb waived his appellate challenge by failing to ensure the proffered evidence was transmitted on appeal. Finally, the trial court did not abuse its discretion in declining to give the proposed "reasonable theory of innocence" jury instruction when there was direct evidence to prove Cobb's possession of the firearm.

[60] Affirmed.

Altice, C.J., and May, J., concur.